IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SPENCER J. AND SARA K. LAMBETH | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | Civil Action File No. |
| v. | ) | _____ |
| | ) | |
| CITY OF SANDY SPRINGS, GEORGIA | ) | |
| by and through its Mayor and City Council; | ) | |
| CITY OF ATLANTA, GEORGIA by and | ) | **JURY TRIAL DEMANDED** |
| through its Mayor and City Council; | ) | |
| THREE LAKES CORPORATION, | ) | |
| a Georgia Corporation; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

## COMPLAINT FOR CIVIL PENALTIES & INJUNCTIVE RELIEF

COME NOW the Plaintiffs, Spencer J. and Sara K. Lambeth ("Lambeths"),

and file this Complaint for Civil Penalties and Injunctive Relief against

Defendants City of Sandy Springs, Georgia; City of Atlanta, Georgia; and Three

Lakes Corporation to enforce violations of the Clean Water Act, 33 U.S.C. §1251 *et*

*seq.*, stemming from the draining of Lower Lake Forrest.

## JURISDICTION AND VENUE

1.

This Court has jurisdiction over this action under the provisions of § 505 of the Federal Water Pollution Control Act Amendment of 1972 (hereinafter "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1) pursuant to 28 U.S.C. § 1331 (federal question) because this action is brought by Lambeths as private attorneys general for past and ongoing violations of the CWA.

2.

Lambeths sent the City of Sandy Springs, Georgia ("Sandy Springs"), City of Atlanta, Georgia ("Atlanta"), and the Three Lakes Corporation ("TLC") the required Notice of Intent to Sue letter, pursuant to CWA § 505, 33 U.S.C. § 1365. A copy of this letter is attached hereto at Exhibit A.

3.

Lambeths notified Defendants Sandy Springs and Atlanta (collectively the "Cities") of their claims against the Cities.  Specifically, Lambeths complied with the ante litem notice requirement set forth at O.C.G.A. § 36-33-5, twice providing Notice of Claims (ante litem notice) to both Atlanta and Sandy Springs prior to instituting this action. Copies of the letters to Atlanta are attached hereto at

Exhibit B and copies of the letters to Sandy Springs are attached at Exhibit C.

4.

Those Defendants received said notice letters as evidenced by return postage receipts and other confirmation of receipts.

5.

Venue is proper against all Defendants under the venue provisions of the Clean Water Act, 33 U.S.C. § 1365(c) and 28 U.S.C. § 1391(b) in that the violations alleged occurred and continue to occur in this District, Defendants reside, exist, or have their principle business location within this District and Division, and all property involved in this matter is within this District and Division.

6.

Lambeths hereby demand a trial by jury upon their claims in this lawsuit.

**PARTIES**

7.

Defendant Sandy Springs, Georgia by and through its City Council ("Sandy Springs") is a municipal corporation in the State of Georgia with the authority to sue and be sued.  Sandy Springs is the successor-in-interest of the public road system within its City limits from Fulton County, Georgia.  A portion

of Lake Forrest Dam lies under Lake Forrest Drive, which is part of the public

road system of Sandy Springs.   Sandy Springs may be served with process under

Fed. R. Civ. Proc. 4 by delivering a copy of the Complaint and Summons in this

action to Mayor Rusty Paul, at 7840 Roswell Road, Sandy Springs, Georgia 30350.

8.

Defendant City of Atlanta, Georgia by and through its City Council

("Atlanta") is a municipality in the State of Georgia with the authority to sue and

be sued. A portion of Lake Forrest Dam lies under the Lake Forrest Drive, which

is part of the public road system of Atlanta. Atlanta may be served with process

under Fed. R. Civ. Proc. 4 by delivering a copy of the Complaint and Summons in

this action to the Honorable Mayor Keisha Lance Bottoms at 55 Trinity Avenue,

SW - Suite 2400 - Atlanta, Georgia  30303.

9.

Defendant Three Lakes Corporation ("TLC") is a Georgia for-profit

corporation formed on or around March 18, 1964.  TLC was created for the sole

purpose to hold legal title to and maintain for the benefit of its members certain

tracts of land lying and being in Land Lot 119 of the 17th District of Fulton

County, Georgia and identified by Fulton County Tax District 59 as Parcel

-4-

Numbers 17 011900050395, 17 011900050403, 17 011900060485, 17 011900060477,

17 011900070260, and 17 011900070450, upon which are presently located three

lakes, including Lower Lake Forrest and the upper portion of Lower Lake Forest

Dam which abuts Lambeths' property.   Service may be perfected on TLC under

Fed. R. Civ. Proc. 4 by and through its registered agent, Gregory K. Chapin, 4649

Tall Pines Drive NW, Atlanta (Fulton County), Georgia 30327.

10.

Plaintiffs Spencer J. and Sarah K. Lambeth own and reside on real property

in Fulton County, Georgia, described as Land Lot 0119 of the 17th District, Being

Part of Lot 6, Block K, Unit 8, Lake Forrest Subdivision, also known as 4664 Lake

Forrest Drive, Sandy Springs (Fulton County), Georgia 30342 and identified by

Fulton County as Tax District 59, Parcel 17 011900060394, commonly referred to

as 4664 Lake Forrest Drive, Atlanta, Georgia 30342 (the "Lambeth Property").

Lambeth Property is contiguous to Lower Lake Forrest.

11.

The Lambeth Property includes not only the land, home, driveway and

improvements thereon and/or thereabout, but Lambeths' personal property

located thereon and their rights in relation to their land, including without

-5-

limitation their rights to use, enjoy, and dispose of their property and their right to exclude others from using or possessing their property in whole or in part. The Lambeth Property also includes Lambeths' riparian rights in the lake - Lower Lake Forrest - abutting the back portion of their property.   Lambeths' home overlooks Lower Lake Forrest.

12.

Defendants are, or were at times relevant to this Complaint, the owners of Lake Forrest Dam and otherwise responsible for the maintenance and operation of the dam.

13.

At times relevant to this Complaint, Defendants Atlanta and Sandy Springs took action to draw down and drain Lower Lake Forrest in violation of the Clean Water Act, whereby harming Lambeths and interfering with Lambeths' property rights.  Defendant Three Lakes Corporation upon whose property the actions occurred, authorized, allowed, ratified or was complicit in this action by the Cities.

14.

Defendant TLC is, or was at times relevant to this Complaint, an owner of

Lower Lake Forrest as well as the upstream side of the Lake Forrest Dam and is otherwise responsible for its maintenance. Defendant TLC explicitly or implicitly authorized and/or enabled the draw down and draining of Lower Lake Forrest and the violations complained of herein.

## STATEMENT OF FACTS

### Lower Lake Forest & Dam

15.

Lower Lake Forrest is located along Lake Forrest Drive on the border between the City of Atlanta and the City of Sandy Springs. It was constructed in the 1950s in a tributary of Nancy Creek along with two sister dams upstream referred to as the Middle and Upper Lakes.

16.

The residential home sites bordering the lakes, including the Lambeth Property, were sold pursuant to a subdivision plat showing the lakes.

17.

The location and configuration of Lower Lake Forrest in association with the other two lakes and adjacent properties is shown on the plat of Unit 10 of Lake Forrest Subdivision, Land Lot 119, 17th District recorded in Plat Book 79,

Page 31, of the Fulton County deed records.  See Plat attached hereto as Exhibit D.

18.

The Lake Forrest Dam, which serves to impound Lower Lake Forrest, is located within the Chattahoochee River Basin on an unnamed tributary to Nancy Creek approximately 1.1 miles upstream of the confluence with Nancy Creek.

19.

Lake Forrest Drive, which is a public road, sits atop Lake Forrest Dam. Half of Lake Forrest Drive is located within the city limits of the City of Atlanta and the other half within the city limits of the City of Sandy Springs.

20.

The normal pool elevation of Lower Lake Forrest, as impounded by Lake Forrest Dam, is approximately 916 ft-MSL, with a storage volume of approximately 49 acre-feet.

**Ownership of Lower Lake Forest Dam**

21.

Defendants are the owners and/or operators of Lake Forrest Dam and otherwise responsible for the maintenance and upkeep of the dam.

22.

Defendant TLC's property shown on the plat consists of the Lake Forrest Dam (to the Lake Forrest Drive Right of Way) and Lower Lake Forrest.

23.

Sandy Springs and Atlanta each own one half of the Lake Forrest Drive Right of Way on the top or middle of the dam.

24.

The Cities are owners and/or operators of Lake Forrest Dam by virtue of their ownership and responsibility for Lake Forrest Drive.  Lake Forrest Drive, which lies atop Lake Forrest Dam, is part of the public road system of both Sandy Springs and Atlanta.   The Cities have a proscriptive easement over Lake Forrest Drive and Lake Forrest Dam.

25.

In 2010, Defendant Sandy Springs filed a Petition for Declaratory Judgment in the Superior Court of Fulton County, Civil Action Number 2010-cv-184848, regarding ownership of the dam.  The lawsuit was ultimately settled with Sandy Springs acknowledging an ownership interest along with several individuals and Defendants Atlanta and TLC.

26.

On or around June 2015, the Cities entered into an Intergovernmental Agreement wherein the Cities specifically agreed to share jointly in any repair and future maintenance of the Lake Forrest Dam.

27.

Individuals Gilbert Aleman and William Harrison own properties downstream of Lower Lake Forrest and each owns a portion of the Lake Forrest Dam from the Lake Forrest Drive Right of Way to end of the dam.  The alleged violations did not occur on either's property and neither participated in the conduct complained of here.

**Lambeths' Property**

28.

Lambeths own and reside on property located at 4664 Lake Forrest Drive, Atlanta, Georgia 30342.  Lambeths purchased their property on or around February 23, 2005. The Lambeth Property abuts Lower Lake Forrest with views of the lake from their home.

29.

Lambeths purchased their property because of its location on Lower Lake

Forrest and the views of the water from their home.

30.

The Lambeth Property includes without limitation Lambeths' house and other improvements located thereon including, their dock extending out on Lower Lake Forrest, and other personal property, as well as Lambeths' riparian rights and other property rights at and about the property. Lambeths' property rights include an irrevocable easement to use Lower Lake Forrest.

31.

The Lambeth Property and Lambeths' property rights have been damaged and interfered with as a result of Defendants' conduct which has resulted in the drawing down and draining of Lower Lake Forrest. The draw down and draining of Lower Lake Forrest has caused Lambeths to suffer special damages. Among other damages, the draw down and draining of Lower Lake Forrest has diminished the value of Lambeths' Property.

### Dam Regulation

32.

The Georgia Safe Dams Act, O.C.G.A. § 12-5-370 to § 12-5-385 ("Safe Dams Act") and the rules and regulations promulgated pursuant thereto, Rules and

Regulations for Dam Safety (the "Rules for Dam Safety") establish the legal framework pertaining to the regulation and maintenance of Lake Forrest Dam.

33.

Under the Safe Dams Act, the Georgia Department of Natural Resources ("DNR"), Environmental Protection Division ("EPD"), Safe Dams Program ("SDP") is charged with implementing the Safe Dams Act.  As part of its charge, the SDP is responsible for developing and maintaining an inventory of dams in Georgia, classifying dams, and ensuring compliance of all regulated dams.

34.

As defined by the Safe Dams Act and Rules for Dam Safety, a "dam" is any artificial barrier that impounds or diverts water which is 25 feet or more in height OR has a maximum impounding capacity of 100 acre-feet or more.  If a dam is less than 25 feet high and has less than 100 acre-feet of storage, then the impoundment would be classified as an "exempt" structure.

35.

If a structure meets the definition of a "dam" under the Safe Dams Act and Rules for Dam Safety, the dam is classified as either a Category I or Category II dam.  Under the Safe Dams Act and Rules for Dam Safety, only Category I dams

are regulated.  If the improper operation or failure of the dam would result in probable loss of human life then the dam is classified as a Category I dam.  The location of frequently occupied structures, such as residences, commercial or manufacturing facilities, schools, and churches within the dam-breach zone typically presents a "probable loss of life" situation.

36.

A Category I classification is not an indication of the condition of the dam or the likelihood of failure.  The classification merely relates to the hazard potential should the dam fail.

**Assessment of Lake Forrest Dam**

37.

In March 2009, the Lake Forrest Dam was assessed by Golder Associates ("Golder"), an environmental consulting firm, for the SDP to determine the threat of harm from a potential dam breach.

38.

Golder conducted and prepared a dam breach analysis for the SDP which recommended reclassification of the Lake Forrest Dam as a Category I dam based on the fact that a breach of the dam raised a potential risk to human life because

of the location of frequently occupied structures downstream.

39.

Discussions between SDP and a TLC representative in June 2009 confirmed that Category I designation does not require or suggest that the lake should be lowered.

40.

As a result of the dam breach analysis by Golder, on or around July 30, 2009, Lake Forrest Dam was re-classified as a Category I dam by EPD.

41.

On July 30, 2009, in accordance with the Safe Dams Act and Rules, EPD notified the owners of Lake Forrest Dam of the reclassification.  Specifically, Defendants Atlanta, Sandy Springs, TLC, as well as non-party individuals Aleman and the prior owner of the Harrison Property, were also notified of their reclassification as "owners" of the dam and informed of the requirement to submit a Dam Operation Permit application.

42.

Neither the Defendants nor the non-party individual owners challenged the reclassification of Lake Forrest Dam.

-14-

43.

Neither the reclassification of Lake Forrest Dam as a Category I dam nor subsequent investigations revealed any sudden or immediate threat or danger of the Lake Forrest Dam failing.

44.

An April 2011 report by the SDP of its inspection of Lake Forrest Dam earlier that year notes that the condition of the dam remains unchanged since the 2009 reclassification. The report recommends removing trees from the dam and recommends that the owners / operators obtain an inspection of Lake Forrest Dam by an engineer of record.

45.

In May 2012, Schnabel Engineering (Schnabel) conducted an inspection of Lake Forrest Dam on behalf of Defendant Sandy Springs (Schnabel Report). The Schnabel Report does not list any specific deficiencies with the Lake Forrest Dam but does lament the steep slope of the historically stable dam. Furthermore, the Schnabel Report did not conclude the dam was unsafe nor in any sudden danger or immediate threat of failing. In fact, the Schnabel Report did not mention any danger of failing.

46.

In the spring of 2013, Schnabel installed monitoring wells on the Lake
Forrest Dam.

47.

Additional inspections by Schnabel in 2013 revealed no seepage from Lake
Forrest Dam, no changes to dam conditions, and no movement in the dam
structure.

48.

As of March 30, 2014, monitoring wells still showed no movement of the
Lake Forrest Dam structure.

**Draining of Lower Lake Forrest**

49.

In December 2014, TLC learned that the Cities intended to drain Lower
Lake Forrest completely for dam repairs.

50.

In a public meeting on February 12, 2015, Sandy Springs revealed plans to
unilaterally lower the level of Lower Lake Forrest.  During this meeting, Sandy
Springs refused to commit to restoring Lake Forest to its prior levels and

indicated that it expected Lower Lake Forrest property owners to agree to the

permanent reduction in the size of Lake Forest.

51.

On May 19, 2015, Sandy Springs told TLC it planned to draw down Lake

Forrest by fifty percent (50%) for safety concerns without providing any

justification of those concerns. The remaining Defendants took no action to

challenge or stop this action.

52.

On or around May 21, 2015, almost six (6) years after the reclassification of

Lake Forrest Dam, Defendant Sandy Springs began draining Lower Lake Forrest.

There was no evidence of any sudden or immediate threat or danger of Lake

Forrest Dam failing at this time.

53.

The draw down of Lower Lake Forrest was accomplished by cutting down

the standpipe on the spillway and lowering the elevation of the discharge outlet

with the intent of reducing the lake level by up to fifty percent of capacity.  At the

time this action was taken, there were no plans to restore Lower Lake Forrest to

its normal pool.

54.

No Defendant or any other party obtained or applied for a permit to make any alterations to Lower Lake Forrest or the Lake Forrest Dam.

55.

As of July 2015, the level of Lower Lake Forrest had been dropped approximately six (6) feet.

56.

In February, 2016 the Cities returned to Lower Lake Forrest and began pumping water out of the lake and downstream. The remaining owners, in particular TLC, took no steps to object.  Again, no Defendant nor other party made any effort to apply for or obtain a permit for this activity.

57.

On March 30, 2016, the Cities brought heavy equipment onto TLC's property and began setting up to excavate the dam, presumably pursuant to the May 2015 plans. The following day, Sandy Springs told TLC that Lower Lake Forrest was being lowered permanently to 904 MSL in accordance with the May 2015 plans.

58.

On April 7, 2016, the Cities' contractor began excavating the dam and dredging a portion of Lower Lake Forrest without a permit in violation of the Federal Clean Water Act, 33 U.S.C. § 1251 et seq., breaching the dam, and discharging sediment laden water downstream.  This work continued for days, ignoring directives from the United States Army Corps of Engineers and EPD to cease all work.  It appears that the work in the lake stopped only after the contractor finished the desired work. Photos of the work are attached hereto at Exhibit E.

59.

Throughout this incident and after, the remaining owners made no effort to address, prevent, or object to the violations of the Clean Water Act or the draining of Lower Lake Forrest.

60.

Lower Lake Forrest is an impoundment on perineal tributary of Nancy Creek, which is itself a tributary of the Chattahoochee River. Thus, it is waters of the United States.

61.

The United States Army Corps of Engineers ("ACOE") was informed of the activities on April 8, 2016 and confirmed the activities during an April 12, 2016 site visit.

62.

The ACOE determined that the activities on-site had impacted the approximately three acre lake and the stream with mechanized land clearing, discharges of pollutants, and installation of a culvert which permanently changed the character and level of Lower Lake Forrest. See ACOE email attached hereto at Exhibit F.

63.

Despite ACOE requests to halt all work, the work on TLC's property by the Cities' contractor continued until the work was complete.

64.

The Cities applied for and after-the-fact permit under 33 U.S.C. § 1344, (§404) under Nationwide Permit 3(a-c) to perform maintenance on a culvert.

65.

The Cities claimed the work and the impacts were temporary as part of a

larger dam restoration plan to be implemented.  Defendants did not advise ACOE that the changes in the water bodies were intended to be permanent.

66.

No other dam owners applied for a permit.

67.

The application for the after-the-fact permit stated it was based on the need to remove trees from the slopes and to replace the corroded corrugated metal pipe in the dam.

68.

The work was stated to be part of a larger project under planning for replacement of the dam.

69.

The after-the-fact permit request was under Nationwide Permit 3(a-c) which allows for:

(a) The repair, rehabilitation, or replacement of any previously authorized, currently serviceable structure, or fill, or of any currently serviceable structure or fill authorized by 33 CFR 330.3, provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification.

...This NWP also authorizes the repair, rehabilitation, or replacement

of those structures or fills destroyed or damaged by storms, floods, fire or other discrete events, *provided the repair, rehabilitation, or replacement is commenced, or is under contract to commence, within two years of the date of their destruction or damage.* [emphasis added]

(c) This NWP also authorizes temporary structures, fills, and work necessary to conduct the maintenance activity. Appropriate measures must be taken to maintain normal downstream flows and minimize flooding to the maximum extent practicable, when temporary structures, work, and discharges, including cofferdams, are necessary for construction activities, access fills, or dewatering of construction sites. *Temporary fills must consist of materials, and be placed in a manner, that will not be eroded by expected high flows. Temporary fills must be removed in their entirety and the affected areas returned to pre-construction elevations.* [emphasis added]

(d) This NWP....does not authorize new stream channelization or stream relocation projects.

70.

The permit application states that there will be temporary fills which will be removed after the dam repair work.

71.

Under General Condition 23, the permit application states that no mitigation is necessary because the lake would be restored upon the completion of the dam repair project and thus no loss of jurisdictional waters.

72.

Under General Condition 30, the permit application acknowledges that a

-22-

signed certification will be provided to the ACOE upon completion of the dam

repair work that all work is completed, was conducted in accordance with all

applicable rules and requirements, and that all necessary mitigation has been

completed.

73.

The ACOE approved the after-the-fact Nationwide Permit 3 for temporary

culvert maintenance (SAS-2016-00325) for the Cities only on July 8, 2016 with

conditions including obtaining a Georgia Stream Buffer Variance, and the

General Conditions.  *See* Exhibit G.

74.

The permit application does not state the identity of, or include dam owner

TLC upon whose property all of the work occurred.

75.

The permit application states the proposed work was required by the

Georgia Safe Dams Program though no such order has been issued by that

regulatory body.

76.

The ACOE approval states that it is only valid until the Nationwide Permit

is modified, reissued or revoked.

77.

All Nationwide Permits were reissued on March 18, 2017.

78.

After that date, even though the conditions remained unchanged from 2016 and the project was still incomplete, the Cities failed to seek a new permit authorization for the project.

79.

Defendants have not completed the dam repair project and the lake has not been restored.

80.

Defendants have not complied with General Conditions 23 and 30.

81.

Defendants have failed to complete the dam repair project within two (2) years as required by NWP 3.

82.

Since March 2017 the Cities have maintained the structures and conditions on the TLC property without seeking a new permit.  Defendant TLC has never

been covered by an permit.

**Impacts to Lambeths**

83.

Lambeths have completely lost the use and enjoyment of lake which was the focal point of their property.  Lambeths cannot go kayaking on the lake, fish from their dock, obtain irrigation water for their plants and garden, or otherwise enjoy the amenities of Lower Lake Forrest.

84.

Without the lake, the dry lake bed became overgrown with weeds and grasses allowing coyotes, snakes, and other unwanted animals to populate the former lake.  Lambeths have been deprived of the view for which the home was purchased and the peace and solitude of their dock. The trees and bushes on the Lambeths' Property have suffered for years because the source of irrigation water was the lake.

85.

Lambeths and their property have been damaged and detrimentally impacted by the draining of Lower Lake Forrest and the intentional maintenance of the lake in that drained condition.

## GENERAL ALLEGATIONS

86.

The continued drained condition of Lower Lake Forrest has impacted and continues to adversely impact and damage the Lambeth Property.

87.

The continued drained condition of Lower Lake Forrest has interfered and continues to interfere with Lambeths' use and enjoyment of their property.

88.

The continued drained condition of Lower Lake Forrest has impacted and continues to adversely impact the value of the Lambeth Property.

89.

Each Defendant has ratified the conduct of its employees, representatives, contractors and/or agents, including their co-defendants, which has caused and/or contributed to the continued drained condition of Lower Lake Forrest which has impacted and continues to adversely impact the Lambeth Property.

### Count One - Violation of the Clean Water Act

90.

Paragraphs 1 through 89 are hereby re-alleged and incorporated herein as

if restated in their entirety.

91.

Defendants are aware that pursuant to 33 U.S.C. § 1311, the discharge of any pollutant into waters of the United States without a permit or in violation of a permit, including those obtained under 33 U.S.C. § 1344, is illegal.

92.

Defendants have violated 33 U.S.C. § 1344, §404 of the Clean Water Act by dredging, filling or altering the natural and/or existing course and flow of jurisdictional water without a permit to do so, in violation of an applicable permit, or by allowing such conditions to remain un-remediated.

93.

Based on ACOE documents, the activities carried out by Defendants and on Defendants' property was in violation of the Clean Water Act.  Defendants failed to seek a permit or to provide a pre-discharge notification to the Army Corps of Engineers in violation of Federal regulations where their activities resulted in the discharge of dredged fill material being discharged into waters of the United States or altering the natural and/or existing course and flow of jurisdictional waters.

-27-

94.

Lower Lake Forrest, the tributary to Nancy Creek, and attendant wetlands located adjacent thereto are jurisdictional waters of the United States.

95.

Although an Army Corps of Engineers' permit is required for such activities as those described above pursuant to Clean Water Act § 404, 33 U.S.C. 1344, no permit was obtained prior to undertaking the offensive action.

96.

Although Sandy Springs and Atlanta obtained an after-the-fact Nationwide Permit under the Clean Water Act, neither Defendant TLC nor any other third party has ever sought or obtained permit coverage under the Clean Water Act.

97.

On information and belief, the permit at issue was obtained using incorrect or misleading information.

98.

Defendants Sandy Springs and Atlanta obtained a temporary permit for a permanent impact.

99.

Defendants failed to complete the full project on time or to restore the lake.

100.

Defendants failed to meet all permit conditions.

101.

Defendants have allowed temporary fills and other conditions to remain in place after the required project completion period expired.

102.

Defendants Sandy Springs and Atlanta failed to renew or obtain a new Nationwide Permit for the conditions they have maintained at the site since the expiration of their permit in 2017.  Since the expiration of their previously obtained permit, Defendants Sandy Springs and Atlanta have been in violation of the Clean Water Act for the maintenance of the conditions.

103.

In seeking an after-the-fact permit, the Cities misled the ACOE by representing the project was only of a temporary nature as opposed to permanent.

104.

To the extent the work began as a temporary measure, after the changes to Lower Lake Forrest became permanent, Defendants failed to seek permit coverage for permanent impacts.

105.

The actions of Defendants in the removal of Lower Lake Forrest has resulted, and will continue to result, in negative impacts to navigable waters of the United States where the flow or circulation of such navigable waters may be impaired or the reach of such waters reduced, and where the chemical and biological characteristics of the navigable waters may be impaired and the aquatic environment adversely affected, including but not limited to a negative impact on the chemical, physical, biological and aesthetic value of Lower Lake Forrest, its tributaries and attendant wetlands, yet no permit has been secured or is proposed to be secured as required under Section 404 of the Clean Water Act, 33 U.S.C. 1344.

106.

In light of the foregoing, the Clean Water Act entitles Lambeths to injunctive relief by an order of this Court that requires Defendants to remove or

otherwise remedy the violations of the Clean Water Act and the impacts to waters of the United States by, inter alia:

(A)   enjoining any further violations of the Clean Water Act by Defendants;

(B)   ordering Defendants to immediately change practices and conditions at and on the Lake Forrest Dam so as to cease violations of the Clean Water Act and all applicable state laws incorporated into Clean Water Act permits in Georgia;

(C)   ordering Defendants to restore the physical, chemical, biological and ecological integrity Lower Lake Forrest, the tributary, attendant wetlands, and other jurisdictional waters;

(E)   ordering Defendants to obtain an appropriate permit under the law;

(F)   imposing civil penalties on Defendants for Clean Water Act violations.

(G)   awarding Lambeths their attorney's fees and expenses of litigation;

(H)   ordering that all future activity by Defendants be in strict compliance with all applicable laws.

107.

The Clean Water Act entitles Lambeths to a judgment against Defendants requiring them to pay civil penalties for the Clean Water Act violations, in an amount not to exceed fifty-one thousand five hundred and seventy dollars ($51,570) per day, per violation, injunctive relief as specified herein, and/or payment of Lambeths litigation costs, including Lambeths reasonable attorneys' fees, expert witness fees, and expenses.

WHEREFORE, Lambeths respectfully pray that this Court:

[a]   Issue service of process and grant Lambeths a trial by Jury;

[b]   Enter Judgment in favor of Lambeths and against Defendants on the claims in this Complaint;

[c]   Grant Lambeths the relief requested under the Clean Water Act Count 1 herein;

[d]   Order Defendants to pay for litigation costs and expenses under 33 U.S.C. § 1365;

[e]   Grant Lambeths trial by jury;

[f]   Grant Lambeths such other relief as this Court deems just and proper.

Respectfully submitted this 6th day of June, 2019.


WEISSMAN PC


_____

Martin A. Shelton - Ga. Bar No. 640749
Attorney for Plaintiffs


One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
404.926.4564
martins@weissman.law

## **VERIFICATION**

COMES NOW, Spencer Lambeth, Plaintiff, having personally appeared before me, the undersigned notary public, who, being duly sworn, and states that the facts as alleged in the foregoing Complaint are true and correct.

_____
Spencer Lambeth


Sworn to and subscribed before me this ___5th___ day of ___June___, 2019.

_____
Notary Public (Seal)
My Commission expires: ___7/2/22___

MARTIN A SHELTON
Notary Public, Georgia
Dekalb County
My Commission Expires
July 02, 2022

**<u>VERIFICATION</u>**

COMES NOW, Sara Lambeth, having personally appeared before me, the undersigned notary public, who, being duly sworn, and states that the facts as alleged in the foregoing Complaint are true and correct.

_____
Sara Lambeth

Sworn to and subscribed before me this _____ day of _____, 2019.

_____
Notary Public (Seal)
My Commission expires: 7/2/22

MARTIN A SHELTON
Notary Public, Georgia
Dekalb County
My Commission Expires
July 02, 2022

EXHIBIT A



Weissman Nowack
Curry & Wilco
ATTORNEYS AT LAW

One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Telephone: (404) 926-4500
Fax: (404) 926-4600
**www.wncwlaw.com**

May 2, 2016

**<u>VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED</u>**

City of Sandy Springs
C/o Mayor Rusty Paul
7840 Roswell Road
Sandy Springs, GA 30350

Wendell Willard
City Attorney
City of Sandy Springs
7840 Roswell Road
Sandy Springs, GA 30350

John McDonough, City Manager
City of Sandy Springs, Georgia
7840 Roswell Road
Sandy Springs, GA 30350

R. Kyle Williams
Williams Teusink, LLC
Counsel for Three Lakes Corporation
The High House
309 Sycamore Street
Decatur, Georgia 30030

Anne Kimberly Key
CEO/CFO
McEachern Dredging, Inc.
2223 Southern Grove Road
Lithonia, GA 30058

E.A. Crudup, Jr.
Registered Agent
McEachern Dredging, Inc.
2223 Church Street, SE
Covington, GA 30014

Kasim Reid, Mayor
City of Atlanta
55 Trinity Avenue
Atlanta, GA 30303

Ceasar C. Mitchell
Atlanta City Council President
City of Atlanta
68 Mitchell Street
4th Floor
Atlanta, GA 30303

Three Lakes Corporation
Attn: Gregory K. Chapin
Registered Agent
4649 Tall Pines Drive NW
Atlanta, GA 30327

Charles N. Pursley Jr., Esq.
Counsel for Three Lakes Corporation
Pursley Friese Torgrimson, LLP
Promenade, Suite 1200
1230 Peachtree St., N.E
Atlanta, GA 30309

CT Corporation System
Registered Agent
Schnabel Engineering, LLC
1201 Peachtree Street, NE
Atlanta, GA 30361

Schnabel Engineering, LLC
9800 Jeb Stuart Parkway, Suite 200
Glenn Allen, VA 23059



**Notice of Intent to Sue**
**FWPCA (CWA) Section 505 - 33 U.S.C. § 1365**

RE:   Notice of violations of the Clean Water Act related to Lake Forrest Dam and
        Forrest Lake in Fulton County, Georgia

To Whom It May Concern:

The undersigned counsel represents Spencer Lambeth and Sarah Lambeth (Lambeth) regarding damages to their property located at 4664 Lake Forrest Drive, Sandy Springs, Fulton County, Georgia ("the Property") which has been impacted by the draw-down of Lake Forrest and other activities at the Lake Forest Dam. Though investigations into the causes of these impacts, we have determined that the City of Sandy Springs, Georgia (Sandy Springs), the City of Atlanta (Atlanta), Georgia, Three Lakes Corporation (TLC), Schnabel Engineering, LLC (Schnabel) and McEachern Dredging, Inc. (McEachern) have acted in such ways as to violate the Clean Water Act (CWA).

These CWA violations are impacting Lake Forrest, which is a jurisdictional water, the Property, and jurisdictional waters downstream of Lake Forest.

This letter is written pursuant to Clean Water Act § 505(b), 33 USC § 1365 (b)  and 40 CFR §135.1, 135.2 and 135.3 in order to provide sufficient information to permit you to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the name, address and telephone number of the person giving notice.

***Person or Persons Responsible***:

The Lake Forest Dam, over which Lake Forrest Drive travels, is owned by nine property owners according to a July 22, 2011 title opinion given in unrelated litigation regarding ownership of the dam.  Sandy Springs and Atlanta, each own a portion of the Lake Forrest Drive right of way across the top of the dam by prescriptive easement, though no records of fee ownership are apparent. TLC owns the bed of Lake Forrest and the dam up to the roadbed right of way. The activities which have given rise to this notice have been undertaken by, for, or with the consent of these entities or on property owned by these entities.

Six other properties own the upstream and downstream side approaches and the downstream face of the dam; 4644 Lake Forrest Drive, 4590 Lake Forrest Drive, 4635 Lake Forest Drive, 4625 Lake Forest Drive, 4615 Lake Forest Drive, and 4695 Lake Forest Drive.  There is currently no indication the owners or representatives of these properties have participated in the activities giving rise to this notice.  A copy of this letter is being provided to each of these



owners for informational purposes only.

Sandy Springs is responsible for ongoing violations identified herein as an owner and/or operator the Lake Forest Dam and an entity responsible for the alleged project which has led to the violations. Sandy Springs is a partial owner of the Lake Forest Dam and its ownership of Lake Forrest Dam appears to be by prescriptive easement over the right of way over Lake Forrest Drive.

Atlanta is responsible for ongoing violations identified herein as an owner and/or operator of the Lake Forrest Dam and an entity responsible for the alleged project which has led to the violations. Atlanta is a partial owner of the Lake Forrest Dam and its ownership of Lake Forrest Dam appears to be by prescriptive easement over the right of way over Lake Forrest Drive.

TLC is responsible for ongoing violations identified herein as an owner and/or operator of the Lake Forrest Dam. TLC owns the bed of Lake Forrest and the western or upstream side of Lake Forrest Dam to the right of way for Lake Forest Drive. Activities which give rise to this notice have been undertaken on property owned by TLC or with TLC's authorization or consent.

Schnabel is an engineering firm contracted by Sandy Springs in 2012 to evaluate the stability of Lake Forrest Dam, devise various plans for activities on the dam, and to manage such activities. Schnabel is responsible for managing and undertaking activities which give rise to this notice.

McEachern is a dredging firm contracted by Sandy Springs in 2016 to begin dredging Lake Forest. McEachern is responsible for undertaking activities which give rise to this notice.

***Standard, Limitation or Order Violated:***

Sandy Springs, Atlanta, TLC, Schnabel, and McEachern (the Responsible Parties) have violated and continue to violate the Clean Water Act §§ 301, 402, and 404 by the destruction of jurisdictional waters without a permit, the dredging and filling of jurisdictional waters without a permit, and discharging pollutants from Lake Forrest into jurisdictional waters, including Nancy Creek and its attendant wetlands. The pollutants being discharged include eroded soil, dirt, dredged spoil, sediment, rock, debris and storm water laden with such pollutants.

The Responsible Parties have violated and continue to violate CWA § 301 and § 404 by failing to obtain a permit prior to the draining, destruction, dredging and/or filling jurisdictional waters of the United States and, thereby, causing impacts to the streams, wetlands and lake. *See* 33 C.F.R. § 320.2(f); 33 C.F.R. § 321; 33 C.F.R. § 322; 33 C.F.R. § 323.

The Responsible Parties have violated and continue to violate CWA §§ 301 and 402 by violating the terms of the General Permit GAR100002 (GAR100002) issued under the National



Pollution Discharge Elimination System ("NPDES"). Violations of GAR100002 include, but are not limited to, violations of Part I (C)(4), Part III(A)(1), Part III (D)(1)-(4), Part IV, Part V(A), (D), (E), (F), (I), (K) and (L), and Part VI(A)(1)-(2). Under CWA § 301, 33 U.S.C. §1311, the discharge of any pollutant into waters of the United States from a point source without a permit or while violating a NPDES permit is illegal.

The Responsible Parties failed and continue to fail to properly design, install and maintain Best Management Practices ("BMPs"), including by way of example but not limited to: failure to maintain a floating sediment barrier in Lake Forrest; failure to properly maintain the outflow pipe; failure to install and maintain silt fences; etc. Such actions violate the Georgia Erosion and Sedimentation Act of 1975, O.C.G.A. § 12-7-1 *et seq.* and the Georgia Water Quality Control Act, O.C.G.A. § 12-5-20 *et seq.* and regulations promulgated thereunder. Violations of the state standards are actionable under the CWA.

The Responsible Parties' activities have resulted and continue to result in violations of the standards found in the Rules of Georgia's Department of Natural Resources, Ga. Comp. R. & Regs. 391-3-6, including the following:

(1)     391-3-6-.03(5)(b) which states that "[a]ll waters shall be free from. . . floating debris. . . or other discharges in amounts sufficient to be unsightly or that interfere with legitimate water uses";

(2)     391 -3-6-.03(5)(c) which states that "[a]ll waters shall be free from material related to municipal, industrial or other discharges which produce turbidity, color, odor or other objectionable conditions which interfere with legitimate water uses";

(3)     391-3-6-.03(5)(d) which states that [a]ll waters shall be free from turbidity which results in a substantial visual contrast in a water body due to a man-made activity. . . . For land disturbing activities, proper design, installation, and maintenance of best management practices and compliance with issued permits shall constitute compliance with Paragraph 391-3-6-.03(5)(d)"; and

(4)     391-3-6-. 15(4)(a) which states that "[a]ll pollutants shall receive such treatment or corrective action so as to ensure compliance with... effluent limitations established by the EPA pursuant to [the Clean Water Act]".

The Responsible Parties have failed to obtain a stream buffer variance required by Georgia law, O.C.G.A. § 12-7-6 *et seq.*, as well as local Sandy Springs Ordinance Article V Section 109 *et seq.* and Atlanta Ordinance Chapter 74 Article VII *et seq.*, which is a necessary component of any permitted activity under CWA § 404 in Georgia.

The Responsible Parties have also failed to obtain a proper permit for the construction or



modification of the Lake Forrest Dam from the Georgia Environmental Protection Division (EPD) under O.C.G.A. § 12-5-370 *et seq.* and Ga. R. & Regs. § 391-3-8 *et seq.*, though the plans for the activities were reviewed and acknowledged by the Safe Dams Program of EPD.

Finally, the Responsible Parties have failed to seek or obtain a certification under CWA § 401, 33 U.S.C. § 1341 *et seq.* that its activities and the permanent alteration or removal of Lake Forrest comply with all applicable legal requirements.

### *Activity Constituting Violation*:

The Lake Forrest Dam, which has been in existence for decades with some renovations, is one of three successive adjacent dams owned by TLC on the same Nancy Creek tributary. The Lake Forrest Dam is the furthest downstream dam and Lake Forest receives water from both upper lakes in succession. The Property is situated on Lake Forrest and includes a dock on the lake as well as an irrigation system that relies on Lake Forrest to provide water.

The Lake Forrest Dam was reclassified as a Category 1 Dam under the Georgia Safe Dams Act on July 30, 2009 due to the probable loss of life downstream in the event of a breach. At least five of the owners of the dam, including Sandy Springs, Atlanta, and TLC received this notification.

In 2012, after receiving *Report of Preliminary Engineering Evaluation* from Schnabel, Sandy Springs and Atlanta decided that Lake Forrest Dam was in danger of catastrophic failure and presented immediate concern of danger to human life. The alleged issue is the corrosion and imminent failure of the stand pipe which forms the primary spillway for the dam. However, nothing was done to address this allegedly emergent threat.

In 2014, Schnabel proposed to draw down Lake Forrest and discussed this concept in public meetings. In April, 2015, Schnabel provided a design plan for the temporary draw down of Lake Forrest, removal of the stand pipe, and its replacement with a concrete encased culvert to carry water downstream and maintain Lake Forrest in an altered lower state. However, the plan is not acted upon despite the allegedly emergent threat until late May/early June 2015. Indeed, these plans were not provided to EPD's Safe Dams Program until June, 2015. It was not until November 24, 2015 that EPD approves the plans noting however, that the plans do not constitute an appropriate submission for the renovation of the Lake Forrest Dam and that all owners have missed the deadline for submitting such renovation plans.

Beginning on May 22, 2015, representatives of one or more of the Responsible Parties commence work on lowering or altering the flow of water in Lake Forrest and to work on the dam spillway. Engineers working at the behest of Sandy Springs entered the Property without permission. After some delay, Sandy Springs asserted that the threat to human life allows it to undertake activities on the lake and dam under its police power. Sandy Springs still has not



obtained any permits despite several years of planning to undertake this work. In June and July of 2015 the spillway pipe for Lake Forrest was physically cut to partially drain Lake Forrest. Over the next several months, pumps were used to fully drain Lake Forrest though little else is done to the spillway. In December, 2015 the failure to properly maintain a trash rack lead to the blockage of the decimated spillway and Lake Forrest returned to full pool for several months without any other negative consequences.

Beginning on April 7, 2016, representatives of the Responsible Parties began using heavy machinery to dredge the lake and made alterations to the Lake Forrest Dam. As part of these activities dredged spoil was dumped directly into the spillway and downstream. Dredging, filling, and other construction activities have continued unabated and without any permitting authorization each day since then. Sediment has been dredged and intentionally dumped or allowed to flow downstream. The spillway on the dam has been further altered to insure permanent changes to the nature and condition of Lake Forrest. The Responsible Parties have undertaken the construction and installation of the concrete culvert in place of the spillway, the same one called for in their plans for years. No effort has been made to obtain any permits or to comply with the requirements of the CWA. No effort has been made to provide any effective erosion and sediment controls and what paltry attempts have been undertaken are undermined by improper installation and maintenance. Sediments continue to flow downstream and Lake Forrest now exists in an apparent permanent altered state.

Although the Responsible Parties claimed the actions of April, 2016 were undertaken in response to an emergency, the years of careful planning, public meetings, and discussion show that such statements are questionable.

### *Location of Alleged Violation(s)*:

Violations of the CWA have occurred and continue to occur at the Property, Lake Forrest Dam and Lake Forrest all of which are in Fulton County, Georgia.

### *Date or Dates of Violations*:

Ongoing violations of the CWA have occurred and continue to occur at or around Lake Forrest, the Lake Forrest Dam, and the Property. Specifically, on May 21, 2015, agents, representatives, and/or contractors of Sandy Springs trespassed on the Property. After a request to cease all activities was given on May 21, 2015, the Responsible Parties began to drain Lake Forrest on May 22, 2015. Activities around the spillway began approximately June 1, 2015, and continue to the present day. Upon information and belief, specific dates of violations include: June 6, 2015, June 7, 2015, June 8, 2015, June 9, 2015, June 10, 2015, June 11, 2015, June 12, 2015, July 7, 2015, March 8, 2016, April, 11, 2016, April 12, 2016, April 13, 2016, and have continued each day since to the date of this letter.



*May 2, 2016 CWA Notice of Intent to Sue*
*Page 7 of 9*

Moreover, sediment, eroded soils and other pollutants, which have been dredged, and deposited in jurisdictional waters remain unremediated. The dredging and filling activities remain unremediated. The alteration and destruction of jurisdictional waters, first begun in late May/early June 2015 and accelerated in April 2016, remain unremediated.

Each day that violations of the CWA related to jurisdictional waters remain unremediated in those waters constitutes an ongoing and continuing violation of the CWA. *See City of Mountain Park, GA v. Lakeside at Ansley, LLC et al.*, 560 F. Supp. 2d 1288 (N.D. Ga. 2008). These violations are ongoing violations and each day that these waters remain impacted constitutes a new violation of the CWA.

**Full Name, Address and Telephone Number of Person Giving Notice**:

The persons giving notice are Spencer and Sarah Lambeth who own real property at 4664 Lake Forrest Drive, Sandy Springs, Fulton County, Georgia. Any communications regarding this matter shall be directed to the undersigned counsel at the address, phone number and email on this letterhead or as follows which shall also serve as the contact information for Lambeth:

Martin A. Shelton, Esq.
404-926-4564
martins@wncwlaw.com

**State Law Claims and Supplemental Ante Litem Notice**:

The actions of the Responsible Parties have resulted in damages to the Property and have given rise to claims for continuing trespass, nuisance, inverse condemnation as well as statutory violations which must be addressed. Thus, this letter will also serve as a demand that Sandy Springs immediately and permanently abate the nuisance and trespass created and maintained by Sandy Spring's actions or omissions, and take immediate action to fully remediate the Property, to repair the existing damages and to prevent any further impacts to the Property including payment for all injuries, losses, damages, costs, fees, and expenses related to this matter arising from the ongoing damages.

Our clients are also entitled to seek attorney's fees from the Responsible Parties under O.C.G.A. § 13-6-11, which can be awarded against a defendant where it has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense. An award of damages for nuisance or trespass, intentional torts, or for the violation of environmental statutes, supports a claim for expenses pursuant to O.C.G.A. § 13-6-11 under the theory that the intention evokes the "bad faith" necessary for recovery under that statute.

**Conclusion**



*May 2, 2016 CWA Notice of Intent to Sue*
*Page 8 of 9*

The failure to remedy any of the violations set forth in this letter can result in a court order enjoining further violations, awarding attorney's fees under 33 U.S.C. § 1365, and imposing civil penalties beginning at $37,500.00 per violation, per day. During the sixty (60) day notice period, we are available to discuss this matter with you. As we do not intend to delay this lawsuit once the notice period has expired, you should immediately institute negotiations if you would like to avoid litigation of this matter.

Sincerely,

Martin A. Shelton

cc:     Spencer Lambeth

**Other Persons Receiving Notice Via Certified Mail Return Receipt Requested:**

Gina McCarthy, Administrator
Environmental Protection Agency
Mel Rios Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Heather McTeer Toney,  Regional Administrator
Environmental Protection Agency, Region 4
Atlanta Federal Center
61 Forsyth Street, SW
Atlanta, GA 30303-3 104

Judson H. Turner, Director
Georgia Environmental Protection Division
2 Martin Luther King Jr. Drive, SE
Suite 1152/East Tower
Atlanta, Georgia 30334-9000

Loretta Lynch, Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001



*May 2, 2016 CWA Notice of Intent to Sue*
*Page 9 of 9*

**Others Receiving Copy of Notice:**

Anastasios & Carolyn Lambrou
4644 Lake Forest Drive
Sandy Springs, Georgia 30342

Robert Rinck
4590 Lake Forrest Drive
Atlanta, Georgia 30328

Michael Marberry
4635 Lake Forrest Drive
Atlanta, Georgia 30342

Gilbert Aleman
4625 Lake Forrest Drive
Sandy Springs, Georgia, 30342

Su Longman
4615 Lake Forest Drive
Sandy Springs, GA, 30342

Alexia Poole
4695 Lake Forest Drive
Sandy Springs, Georgia 30342

# EXHIBIT B



Weissman Nowack
Curry & Wilco
ATTORNEYS AT LAW

One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Telephone: (404) 926-4500
Fax: (404) 926-4600
www.wncwlaw.com

September 16, 2015

**Via Certified Mail,**
**Return Receipt Requested**

Kasim Reid, Mayor
City Of Atlanta
55 Trinity Avenue
Atlanta, GA 30303

Ceasar C. Mitchell
Atlanta City Council President
City of Atlanta
68 Mitchell Street
4th Floor
Atlanta, GA 30303

  Re:  Notice of Claims Pursuant to O.C.G.A. § 36-33-5 and Request to Abate Nuisance
     Pursuant to O.C.G.A. § 41-1-1 Related to Lake Forrest Dam

To Whom It May Concern:

  The undersigned counsel and the law firm of WEISSMAN, NOWACK, CURRY & WILCO,
P.C. have been retained to represent Spencer and Sarah Lambeth ("Lambeths") regarding
damages to their property at 4664 Lake Forrest Drive, Atlanta, Georgia ("Property"). The
Property abuts a lake known as Lake Forrest ("Lake"). Pursuant to O.C.G.A. § 36-33-5, the
Lambeths hereby give notice of claims against the City of Atlanta ("City") which arise from the
City's and the City of Sandy Springs' (collectively, the "Cities") unilateral decision to drain the
Lake and handling of the dam remediation project.

  In June, the Cities entered into an Intergovernmental Agreement wherein the two parties
agreed to share jointly in the repair and future maintenance of the Lake Forrest Dam. The
undersigned, on behalf of the Lambeths, sent a Notice of Claims Pursuant to OCGA § 36-33-5
and requests to Abate Nuisance Pursuant to § 41-1-1 Related to Lake Forrest Dam to the City of
Sandy Springs on June 17, 2015.

  Over the course of the past several months, the Cities have acted unilaterally, negligently,
and with careless disregard to the interests of other dam owners, lakefront property owners, and
residents of the Lake Forrest Subdivision with regard to the management, care and remediation

of the Lake Forrest Dam.   On May 20, 2015, Dane Hansen, an engineer with Blount Construction, arrived at the Lake with instructions from the Cities to draw down the Lake. Subsequently, the Cities incrementally drained the Lake such that within one month the Lake was near half capacity.   The Lambeths understand that the Cities are draining the Lake because the Cities believe that the dam on the east side of the Lake is in an unstable condition, which the Cities allege must be addressed immediately.   Notably, it is our understanding that the Cities have not done any further investigation on the integrity of the Dam since 2013, so it is confusing that the Cities only now insist that draining the Lake must not be delayed, since the Cities have had the same data since 2013 without any indication of an eminent threat.   Moreover, as there is no current remediation plan, it is reasonably anticipated that the lake will remain drained three to five years and perhaps indefinitely.

When the Lambeths purchased the Property, it was lakefront property.   As a result of the Cities' decision to drain the lake though, the Property is no longer lakefront.   Instead, as the water level drops, a mud pit is emerging in place of the Lake.   Thus, the actions of the Cities, and their agents and/or contractors, have resulted in damages to the Property.   *See Forsyth County v. Martin*, 279 Ga. 215 (2005).   The mud pit is a nuisance to the Lambeths pursuant to O.C.G.A. § 41-1-1, and amounts to inverse condemnation.   Thus this letter will also serve as a demand that the Cities immediately and permanently abate the nuisance and trespass created and maintained by the Cities' actions or omissions, and take immediate action to fully remediate the Property to repair the existing damages and to prevent any further impacts to the Property.

My client is suffering serious adverse impacts as a result of the Cities' acts and omissions.   The valuation of such damages is, of course directly proportional to the length of time such conditions are permitted to exist.   My client will seek full compensation for the unauthorized use, appropriation, injury to, and damage to the Property; including payment for al injuries, losses, damages, costs, fees, and expenses related to this matter arising from the ongoing damages. To date, Lambeths have suffered a diminished property value of $540,000.

Sincerely,

Martin A. Shelton

cc:   Spencer and Sarah Lambeth
Charles Pursley, counsel for Three Lakes Corporation, LLC
Renee Shepherd, counsel for City of Atlanta
Wendell Willard, counsel for City of Sandy Springs



Weissman Nowack
Curry & Wilco
ATTORNEYS AT LAW

One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Telephone: (404) 926-4500
Fax: (404) 926-4600
**www.wncwlaw.com**

May 6, 2016

**<u>Via Certified Mail,
Return Receipt Requested</u>**

Kasim Reid, Mayor
City Of Atlanta
55 Trinity Avenue
Atlanta, GA 30303

Ceasar C. Mitchell
Atlanta City Council President
City of Atlanta
68 Mitchell Street
4th Floor
Atlanta, GA 30303

Re:   Notice of Claims Pursuant to O.C.G.A. § 36-33-5 and Request to Abate Nuisance
Pursuant to O.C.G.A. § 41-1-1 Related to Lake Forrest Dam

To Whom It May Concern:

The undersigned counsel and the law firm of WEISSMAN, NOWACK, CURRY & WILCO,
P.C. have been retained to represent Spencer and Sarah Lambeth ("Lambeths") regarding
damages to their property at 4664 Lake Forrest Drive, Atlanta, Georgia ("Property"). The
Property abuts a lake known as Lake Forrest ("Lake"). Pursuant to O.C.G.A. § 36-33-5, the
Lambeths hereby give notice of additional claims against the City of Atlanta ("City") which arise
from the City's and the City of Sandy Springs' (collectively, the "Cities") unilateral decision to
drain the Lake and handling of the dam remediation project.

In June, 2015 the Cities entered into an Intergovernmental Agreement wherein the Cities
agreed to share jointly in the repair and future maintenance of the Lake Forrest Dam. The
undersigned, on behalf of the Lambeths, sent a Notice of Claims Pursuant to OCGA § 36-33-5
and requests to Abate Nuisance Pursuant to § 41-1-1 Related to Lake Forrest Dam to the City of
Sandy Springs on June 17, 2015. This was followed on September 16, 2015 with a similar
Notice of Claims Pursuant to OCGA § 36-33-5 and requests to Abate Nuisance Pursuant to § 41-
1-1 Related to Lake Forrest Dam to the City of Atlanta. This correspondence supplements both
of those prior letters to cover additional actions and omissions harmful to the Lambeths. The
content of the Lambeths' prior letter of September 16, 2015 is hereby incorporated by reference.

*Lambeth Second Ante-Litem Letter to Atlanta*
*May 6, 2015*
*Page 2*



Beginning on April 7, 2016, representatives of the Cities and other private parties (Responsible Parties) began using heavy machinery to dredge the lake and made alterations to the Lake Forrest Dam. As part of these activities dredged spoil was dumped directly into the spillway and downstream. Dredging, filling, and other construction activities have continued unabated and without any permitting authorization each day since then. Sediment has been dredged and intentionally dumped or allowed to flow downstream. The spillway on the dam has been further altered to insure permanent changes to the nature and condition of the Lake. The Responsible Parties have undertaken the construction and installation of the concrete culvert in place of the spillway, as planned in writing for years. No effort has been made to obtain any permits or to comply with the requirements of applicable local, state, and federal laws. No effort has been made to provide any effective erosion and sediment controls and what paltry attempts have been undertaken are undermined by improper installation and maintenance. Sediments continue to flow downstream and Lake Forrest now exists in an apparent permanent altered state.

When the Lambeths purchased the Property, it was lakefront property. As a result of the Cities' decision to drain the lake though, the Property is no longer lakefront. Instead, as the water level drops, a mud pit is emerging in place of the Lake. Thus, the actions of the Cities, and their agents and/or contractors, have resulted in damages to the Property. *See Forsyth County v. Martin*, 279 Ga. 215 (2005). The mud pit is a nuisance to the Lambeths pursuant to O.C.G.A. § 41-1-1, and amounts to inverse condemnation. Thus this letter will also serve as a demand that the Cities immediately and permanently abate the nuisance and trespass created and maintained by the Cities' actions or omissions, and take immediate action to fully remediate the Property to repair the existing damages and to prevent any further impacts to the Property.

My client is suffering serious adverse impacts as a result of the Cities' acts and omissions. The valuation of such damages is, of course directly proportional to the length of time such conditions are permitted to exist. My client will seek full compensation for the unauthorized use, appropriation, injury to, and damage to the Property; including payment for al injuries, losses, damages, costs, fees, and expenses related to this matter arising from the ongoing damages. To date, Lambeths have suffered a diminished property value of $540,000.

Sincerely,

Martin A. Shelton

*Lambeth Second Ante-Litem Letter to Atlanta*
*May 6, 2015*
*Page 3*



cc:     Spencer and Sarah Lambeth
        Charles Pursley, counsel for Three Lakes Corporation, LLC
        Renee Shepherd, counsel for City of Atlanta
        Wendell Willard, counsel for City of Sandy Springs

EXHIBIT C



Weissman Nowack
Curry & Wilco
ATTORNEYS AT LAW

June 17, 2015

One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Telephone: (404) 926-4500
Fax: (404) 926-4600
www.wncwlaw.com

**Via Certified Mail,**
**Return Receipt Requested**

John McDonough, City Manager
City of Sandy Springs, Georgia
7840 Roswell Road
Sandy Springs, GA 30350

Rusty Paul, Mayor
City of Sandy Springs, Georgia
7840 Roswell Road
Sandy Springs, GA 30350

John Paulson - District 1
Ken Dishman - District 2
Graham McDonald - District 3
Gabriel Sterling - District 4
Tibby DeJulio –District 5 (Mayor Pro Temore)
Andy Bauman – District 6
Sandy Spring City Council
7840 Roswell Road
Sandy Springs, GA 30350

Re:   Notice of Claims Pursuant to O.C.G.A. § 36-33-5 and Request to Abate Nuisance
Pursuant to O.C.G.A. . § 41-1-1 Related to Lake Forrest Dam

To Whom It May Concern:

The undersigned counsel and the law firm of WEISSMAN, NOWACK, CURRY & WILCO, P.C. have been retained to represent Spencer and Sarah Lambeth ("Lambeths") regarding damages to their property at 4664 Lake Forrest Drive, Atlanta, Georgia ("Property"). The Property abuts a lake ("Lake"). Pursuant to O.C.G.A. § 36-33-5, the Lambeths hereby give notice of claims against the City of Sandy Springs ("City") which arise from the City's unilateral decision to drain the Lake and handling of the dam remediation project.

Over the course of the past several months, the City of Sandy Springs has acted unilaterally, negligently, and with careless disregard to the interests of other dam owners, lakefront property owners, and residents of the Lake Forrest Subdivision with regard to the management, care and remediation of the Lake Forrest Dam. On May 20, 2015, Dane Hansen, an engineer with Blount Construction, arrived at the Lake with instructions from the City to draw down the Lake. Since that date, the City has incrementally drained the Lake, and nearly one month later, the Lake is near half capacity. The Lambeth s understand that the City is draining the Lake because the City believes that the dam on the east side of the Lake is in an unstable condition, which the City alleges must be addressed immediately. Notably, it is our understanding that the City has not done any further investigation on the integrity of the Dam

*Lambeth Ante-Litem Letter*
*June 17, 2015*
*Page 2*

since 2013, so it is confusing that the City only now insists that draining the Lake must not be delayed, since the City has had the same data since 2013 without any indication of an eminent threat.  Moreover, as there is no current remediation plan, it is reasonably anticipated that the lake will remain drained three to five years and perhaps indefinitely.

When the Lambeths purchased the Property, it was lakefront property.  As a result of the City's decision to drain the lake though, the Property is no longer lakefront.  Instead, as the water level drops, a mud pit is emerging in place of the Lake.   Thus, the actions of the City, its agents and/or contractors, have resulted in damages to the Property.  *See Forsyth County v. Martin*, 279 Ga. 215 (2005).   The mud pit is a nuisance to Lambeths pursuant to O.C.G.A. § 41-1-1, and amounts to inverse condemnation.   Thus this letter will also serve as a demand that the City immediately and permanently abate the nuisance and trespass created and maintained by the City's actions or omissions, and take immediate action to fully remediate the Property to repair the existing damages and to prevent any further impacts to the Property.

My client is suffering serious adverse impacts as a result of the City's acts and omissions. The valuation of such damages is, of course directly proportional to the length of time such conditions are permitted to exist.  My client will seek full compensation for the unauthorized use, appropriation, injury to, and damage to the Property; including payment for al injuries, losses, damages, costs, fees, and expenses related to this matter arising from the ongoing damages. To date, Lambeth has suffered a diminished property value of $540,000.

Sincerely,

Martin A. Shelton

cc:    Spencer and Sarah Lambeth
       Charles Pursley, counsel for Three Lakes Corporation, LLC
       Wendell Willard, counsel for City of Sandy Springs



Weissman Nowack
Curry & Wilco
ATTORNEYS AT LAW

One Alliance Center, 4th Floor
3500 Lenox Road
Atlanta, Georgia 30326
Telephone: (404) 926-4500
Fax: (404) 926-4600
www.wncwlaw.com

May 6, 2016

**Via Certified Mail,**
**Return Receipt Requested**

John McDonough, City Manager                Rusty Paul, Mayor
City of Sandy Springs, Georgia                City of Sandy Springs, Georgia
7840 Roswell Road                            7840 Roswell Road
Sandy Springs, GA 30350                      Sandy Springs, GA 30350

John Paulson - District 1
Ken Dishman - District 2
Graham McDonald - District 3
Gabriel Sterling - District 4
Tibby DeJulio –District 5 (Mayor Pro Temore)
Andy Bauman – District 6
Sandy Spring City Council
7840 Roswell Road
Sandy Springs, GA 30350

   Re: Notice of Claims Pursuant to O.C.G.A. § 36-33-5 and Request to Abate Nuisance
      Pursuant to O.C.G.A. . § 41-1-1 Related to Lake Forrest Dam

To Whom It May Concern:

  The undersigned counsel and the law firm of WEISSMAN, NOWACK, CURRY & WILCO,
P.C. have been retained to represent Spencer and Sarah Lambeth ("Lambeths") regarding
damages to their property at 4664 Lake Forrest Drive, Atlanta, Georgia ("Property"). The
Property abuts a lake ("Lake"). Pursuant to O.C.G.A. § 36-33-5, the Lambeths hereby give
notice of additional claims against the City of Sandy Springs ("City") and the City of Atlanta
which arise from the City's and the City of Atlanta's (collectively, the "Cities") unilateral
decision to drain the Lake and handling of the dam remediation project.

  In June, 2015 the Cities entered into an Intergovernmental Agreement wherein the Cities
agreed to share jointly in the repair and future maintenance of the Lake Forrest Dam. The
undersigned, on behalf of the Lambeths, sent a Notice of Claims Pursuant to OCGA § 36-33-5
and requests to Abate Nuisance Pursuant to § 41-1-1 Related to Lake Forrest Dam to the City of
Sandy Springs on June 17, 2015. This was followed on September 16, 2015 with a similar
Notice of Claims Pursuant to OCGA § 36-33-5 and requests to Abate Nuisance Pursuant to § 41-
1-1 Related to Lake Forrest Dam to the City of Atlanta. This correspondence supplements both
of those prior letters to cover additional actions and omissions harmful to the Lambeths. The
content of the Lambeths' prior letter of June 17, 2015 is hereby incorporated by reference.

*Lambeth Second Ante-Litem Letter to Sandy Springs*
*May 6, 2015*
*Page 2*



Beginning on April 7, 2016, representatives of the Cities and other private parties (Responsible Parties) began using heavy machinery to dredge the lake and made alterations to the Lake Forrest Dam. As part of these activities dredged spoil was dumped directly into the spillway and downstream. Dredging, filling, and other construction activities have continued unabated and without any permitting authorization each day since then. Sediment has been dredged and intentionally dumped or allowed to flow downstream. The spillway on the dam has been further altered to insure permanent changes to the nature and condition of the Lake. The Responsible Parties have undertaken the construction and installation of the concrete culvert in place of the spillway, as planned for years. No effort has been made to obtain any permits or to comply with the requirements of applicable local, state, and federal laws. No effort has been made to provide any effective erosion and sediment controls and what paltry attempts have been undertaken are undermined by improper installation and maintenance. Sediments continue to flow downstream and Lake Forrest now exists in an apparent permanent altered state.

When the Lambeths purchased the Property, it was lakefront property. As a result of the City's decision to drain the lake though, the Property is no longer lakefront. Instead, as the water level drops, a mud pit is emerging in place of the Lake. Thus, the actions of the City, its agents and/or contractors, have resulted in damages to the Property. *See Forsyth County v. Martin*, 279 Ga. 215 (2005). The mud pit is a nuisance to Lambeths pursuant to O.C.G.A. § 41-1-1, and amounts to inverse condemnation. Thus this letter will also serve as a demand that the City immediately and permanently abate the nuisance and trespass created and maintained by the City's actions or omissions, and take immediate action to fully remediate the Property to repair the existing damages and to prevent any further impacts to the Property.

My client is suffering serious adverse impacts as a result of the City's acts and omissions. The valuation of such damages is, of course directly proportional to the length of time such conditions are permitted to exist. My client will seek full compensation for the unauthorized use, appropriation, injury to, and damage to the Property; including payment for al injuries, losses, damages, costs, fees, and expenses related to this matter arising from the ongoing damages. To date, Lambeth has suffered a diminished property value of $540,000.

Sincerely,

Martin A. Shelton

cc:     Spencer and Sarah Lambeth

*Lambeth Second Ante-Litem Letter to Sandy Springs*
*May 6, 2015*
*Page 3*



    Charles Pursley, counsel for Three Lakes Corporation, LLC
    Wendell Willard, counsel for City of Sandy Springs

# EXHIBIT D



EXHIBIT E





# EXHIBIT F

## Brannon, Elisha A SAS

| | |
|---|---|
| **From:** | Brannon, Elisha A SAS |
| **Sent:** | Thursday, April 21, 2016 11:41 AM |
| **To:** | 'Hanson, Dane' |
| **Cc:** | jayash@atlantaga.gov; Chuck Wilson; 'Rick Whiteside'; Castleberry, Larry |
| **Subject:** | RE: SAS-2016-00325; Lake Forest Dam Maintenance |

Good Afternoon Dane,

Thank you for returning my call to discuss the Lake Forest Dam Maintenance Project.

During our conversation I explained that the project needs a permit from our office and that even though one was not obtained prior to work starting, the Corps was not going to send a formal cease and desist letter as we would normally do as long as certain conditions were met, such as: Submitting an application for a Section 404 permit, stabilizing the disturbed area with proper BMPs, and discussions of corrective measures with the contractor on what constitutes a violation of the Clean Water Act needed to take place so that they no longer continue with those activities.

The items of concern with the recent and current activities are primarily with the way the contractor is conducting activities in Waters of the U.S. (WOUS) (i.e the lake). While we do have concerns with the permit not being obtained prior to construction, this has been resolved with the permit application which I will process concurrently with the activities. The contractor did not have BMPs in place to protect the waters on site nor the waters located downstream of the project area. The list of concerns that need to be immediately addressed and continued to be adhered to are as follows:

1. The turbidity curtain was not operating correctly. It was not anchored properly or in an appropriate location to prevent heavy sediments from entering the un-disturbed areas within the project area.

2. The turbidity curtain was acting solely as a buoy. In other words there was no curtain attached to the floating structure. It appears it may have still been rolled up and never unrolled prior to work starting. I'm not sure why it was even placed in the water since it served no function what so ever. This is simply unacceptable on any project site.

3. The pumping of the water to downstream areas should have been pumped from the un-disturbed area of the turbidity curtain, so the water that is pumped downstream is non-turbid water located in and around the disturbed area. Again, this would not have been effective on this project site anyway, since the one and only BMP on-site was not functioning correctly anyway, so all of the project site was turbid and had re-distributed with dredged and fill material within the water column .

4. The most shocking of all is the fact that the contractors were using their backhoe to scoop up lake bed material (dredged material) and sediment-laden water and directly discharge it into the riser pipe! This is a flagrant violation of the Clean Water Act. All dredged material should have been contained in an upland area and NOT allowed to re-enter a WOUS unless the Corps specifically gave permission to do, which we did not.

5. While the contractors were digging their trench to place the new structure that was to connect to the riser pipe, they took the material excavated and then discharged the dredged material back into the lake on top of a uncontained spoil pile a few feet away from where they were excavating. There was no BMPs to contain the dredged material from re-entering the water. In fact, they were discharging it into an area that was not drained, so directly back into the lake. Again, unacceptable!

These are the main concerns with the activities that have taken place to date. And I must disagree, the contractor has not addressed these issues. From the day the Corps was notified of this violation, the contractor has continued to violate the Clean Water Act by additional activities that are in clear violation (as stated above). I understand from our conversation that the contractors have finished draining the lake and should be complete with their activities and will no longer be on-site. This does not constitute resolution of the violation but hopefully will prevent future violations within this project site.

While the Corps has not pursued administrative penalties and fines for this violation as allowed by our Federal regulations nor have we referred this project to EPA for the flagrant nature of these activities, the City of Sandy Springs has been listed as a violator. Any future violations will be considered a repeat violator offence and may be subject to enforcement actions.

A permit application will be required in the future once a final design for the dam rehabilitation is complete.


Sincerely,
Elisha Brannon


-----Original Message-----
From: Hanson, Dane [mailto:DHanson@SandySpringsga.gov]
Sent: Wednesday, April 20, 2016 2:25 PM
To: Brannon, Elisha A SAS <Elisha.A.Brannon@usace.army.mil>
Cc: jayash@atlantaga.gov; Chuck Wilson <cwilson@schnabel-eng.com>
Subject: [EXTERNAL] RE: SAS-2016-00325; Lake Forest Dam Maintenance

Ms. Brannon,

Thank you for taking the time to talk to me about your email below. As discussed, I believe the contractor has addressed the concerns you discussed with Chuck Wilson and Rick Whiteside. If you could send me the quick summary of issues we talked about, I would appreciate it. I will go through and outline how each concern was handled or appropriately direct the contractor if there is still something that needs to be addressed. As discussed, it is important for the contractor to complete the work on the existing riser and the newly installed pipe in order to secure the work area to avoid a catastrophic failure of the dam. If you have any questions, please feel free to give me a call.


Dane M. Hanson, P.E.
Stormwater Services Unit Manager - Public Works
City of Sandy Springs
7840 Roswell Road, Building 500
Sandy Springs, GA 30350
Phone: 770.206.2524
www.sandyspringsga.gov
twitter.com/sandyspringsga - Follow for Breaking News and Traffic Alerts
facebook.com/CoSSGA - Like for Community News and Discussions


-----Original Message-----
From: Brannon, Elisha A SAS [mailto:Elisha.A.Brannon@usace.army.mil]
Sent: Wednesday, April 20, 2016 10:31 AM
To: Hanson, Dane <DHanson@SandySpringsga.gov>; jayash@atlantaga.gov

Subject: FW: SAS-2016-00325; Lake Forest Dam Maintenance

Mr. Hanson and Mr. Ash,

Apparently the email in the application submitted was wrong. I found the correct emails online, so again I am re-sending this email.

Sincerely,
Elisha Brannon

-----Original Message-----
From: Brannon, Elisha A SAS
Sent: Wednesday, April 20, 2016 10:26 AM
To: 'dhanson@sandysprings.gov' <dhanson@sandysprings.gov>; 'jayash@atlantaga.gov' <jayash@atlantaga.gov>
Subject: RE: SAS-2016-00325; Lake Forest Dam Maintenance

Mr. Hanson and Mr. Ash,

I am sending this email again to ensure it is delivered. I received a notification that one of the emails did not go through.

I look forward to a prompt response.

Elisha A. Brannon
U.S. Army Corps of Engineers
Regulatory Division - Piedmont Branch
1025 Buford Dam Road
Buford, Georgia  30515
Elisha.A.Brannon@usace.army.mil
678-804-5226

-----Original Message-----
From: Brannon, Elisha A SAS
Sent: Tuesday, April 19, 2016 5:20 PM
To: 'dhanson@sandysprings.gov' <dhanson@sandysprings.gov>; 'jayash@atlantaga.gov' <jayash@atlantaga.gov>
Cc: Thames, Kevin SAS <Kevin.D.Thames@usace.army.mil>
Subject: SAS-2016-00325; Lake Forest Dam Maintenance

Dear Mr. Hanson and Mr. Ash,

I have been assigned the proposed project which I recently received a Nationwide Permit application for on Friday 15Apr2016. I recently spoke with Schnabel Engineering (Chuck Wilson) and Corblu Ecology Group (Rick Whiteside) regarding the project as well as a few adjacent landowners that have expressed concerns with potential un-authorized activities that may have been taking place within the project area.

The U.S. Army Corps of Engineers has been charged by Congress, under Section 10 of the Rivers and Harbor Act of 1899 (33 United States Code (U.S.C.) 403) and Section 404 of the Clean Water Act (33 U.S.C. 1344), with the responsibility to regulate all construction and fill activities performed in waters of the United States and their adjacent wetland areas. The placement of fill material into waters of the United States, without prior approval, constitutes a violation of Section 404.

I have confirmed that the project is within the Corps jurisdiction, does require a Section 404 permit, which has not been obtained prior to current activities taking place, and that the contractor on-site is conducting the excavation activities in a manner that is in direct violation of the Clean Water Act.  We are requesting that all work in waters of the United States cease immediately and that you confirm (via email or letter) that work in waters has ceased. Again, we must reiterate that you do not perform any further work in any wetland areas or other waters of the Unites States until this matter is satisfactorily resolved.

I would like to setup a conference call as soon as possible to further discuss resolution of this matter.

Sincerely,

Elisha A. Brannon
U.S. Army Corps of Engineers
Regulatory Division - Piedmont Branch
1025 Buford Dam Road
Buford, Georgia  30515
Elisha.A.Brannon@usace.army.mil
678-804-5226

---

This e-mail message (including any attachments) is for the sole use of the intended recipient(s) and may contain confidential and privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this message (including any attachments) is strictly prohibited. If you have received this message in error, please contact the sender and destroy all copies of the original message (including attachments). The City of Sandy Springs is a public entity subject to the Official Code of Georgia Annotated §§ 50-18-70 to 50-18-76 concerning public records. Email is covered under such laws and thus may be subject to disclosure.

EXHIBIT G



**DEPARTMENT OF THE ARMY**
SAVANNAH DISTRICT, CORPS OF ENGINEERS
1590 ADAMSON PARKWAY, SUITE 200
MORROW, GEORGIA 30260-1777

REPLY TO
ATTENTION OF:

JUL - 8 2016

Regulatory Division
SAS-2016-00325

Mr. Dane Hanson
City of Sandy Springs
7840 Roswell Road
Sandy Springs, Georgia  30350

Dear Mr. Hanson:

I refer to the Pre-Construction Notification submitted on April 14, 2016 and the signed Tolling Agreement submitted June 23, 2016, regarding the request for an after-the-fact Nationwide Permit (NWP) No. 3 verification for the 0.9-acres of impacts to Forrest Lake. Project activities included the drawdown of the previous 3-acre lake to an approximate 0.75-acre lake to accommodate the excavation of a 0.9-acre area and the installation of a new culvert and riser pipe to allow for the lake to remain drained. The project site is located at Lake Forrest Drive, City of Sandy Springs and City of Atlanta, Fulton County, Georgia (Latitude 33.881085, Longitude -84.387634). The request was submitted on your behalf by Corblu Ecology Group. This project has been assigned number SAS-2016-00325. Please refer to this project number in all future correspondence.

We have completed a preliminary Jurisdictional Determination (JD) for the site. The wetlands were delineated in accordance with criteria contained in the 1987 "Corps of Engineers Wetland Delineation Manual," as amended by the most recent regional supplements to the manual.

The wetlands/other waters on the subject property may be waters of the United States within the jurisdiction of Section 404 of the Clean Water Act (33 United States Code (U.S.C.) 1344) and/or Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403). The enclosed Global Positioning System (GPS) delineation entitled "Figure 3, Jurisdictional Waters Map", submitted within the April 14, 2016 PCN application, is an accurate delineation of all the jurisdictional boundaries on the site. This delineation will remain valid for a period of 5-years unless new information warrants revision prior to that date. The placement of dredged or fill material into any waterways and/or their adjacent wetlands or mechanized land clearing of those wetlands would require prior Department of the Army authorization pursuant to Section 404.

- 2 -

Preliminary JDs are advisory in nature and may not be appealed (see 33 Code of Federal Regulations 331.2). If you are not in agreement with this preliminary JD, then you may request an approved JD for your project site or review area.

We have completed coordination with other federal and state agencies as described in Part C (31)(d) of our NWP Program, published in the February 12, 2012, Federal Register, Vol. 77, No. 34, Pages 10184-10290 (77 FR). The NWPs and Savannah District's Regional Conditions for NWPs can be found on our website at http://www.sas.usace.army.mil/Missions/Regulatory/Permitting/GeneralPermits/Nationwi dePermits.aspx. During our coordination procedure, no adverse comments regarding the proposed work were received.

As a result of our evaluation of your project, we have determined that the proposed activity is authorized under an after-the-fact NWP 3 for Maintenance, as described in Part B of the NWP Program. Your use of this NWP is valid only if:

1.  The activity is conducted in accordance with the information submitted and meets the conditions applicable to the NWP, as described at Part C of the NWP Program and the Savannah District's Regional Conditions for NWPs.

2.  You shall obtain and comply with all appropriate federal, state, and local authorizations required for this type of activity. A stream buffer variance may be required from the Georgia Department of Natural Resources, Environmental Protection Division (Georgia EPD), as defined in the Georgia Erosion and Sedimentation Control Act of 1975, as amended. Information concerning variances can be obtained at the Georgia EPD's website at www.epd.georgia.gov, or by calling (404) 463-1511.

3.  All work conducted under this permit shall be located, outlined, designed, constructed and operated in accordance with the minimal requirements of the Georgia Erosion and Sedimentation Control Act of 1975, as amended. Utilization of plans and specifications contained in the "Manual for Erosion and Sediment Control," (Latest Edition), published by the Georgia Soil and Water Conservation Commission, will aid in achieving compliance with the aforementioned minimal requirements.

4.  You shall install and maintain erosion and sediment control measures in upland areas of the project site, in accordance with the Georgia Erosion and Sedimentation Control Act of 1975, as amended, to minimize the introduction of sediment into and the erosion of streams, wetlands and other waters of the United States. This permit does not authorize installation of check-dams, weirs,

- 3 -

riprap, bulkheads or other erosion control measures in streams, wetlands or other waters of the United States. Authorization would be required from the U.S. Army Corps of Engineers prior to installing any erosion control measures in waters of the United States.

5.  You shall install and maintain erosion and sediment control measures for all fill material that is authorized to be discharged in streams, wetlands and other waters of the United States, in accordance with the Georgia Erosion and Sedimentation Control Act of 1975, as amended, and permanently stabilize fill areas at the earliest practicable date.

6.  You fill out and sign the enclosed certification and return it to our office within 30 days of completion of the activity authorized by this permit.

This proposal was reviewed in accordance with Section 7 of the Endangered Species Act. Based on the information we have available, we have determined that the project would have no effect on any threatened or endangered species nor any critical habitat for such species. Authorization of an activity by a NWP does not authorize the "take" of threatened or endangered species. In the absence of separate authorization, both lethal and non-lethal "takes" of protected species are in violation of the Endangered Species Act. See Part (C) of 77 FR for more information.

This verification is valid until the NWP is modified, reissued or revoked. All of the existing NWPs are scheduled to expire on March 18, 2017. It is incumbent upon you to remain informed of changes to the NWPs. Furthermore, if you commence or are under contract to commence this activity before the date that the relevant NWP is modified or revoked, you will have 12 months from the date of the modification or revocation of the NWP to complete the activity under the present terms and conditions of this NWP.

This authorization should not be construed to mean that any future projects requiring Department of the Army authorization would necessarily be authorized. Any new proposal, whether associated with this project or not, would be evaluated on a case-by-case basis. Any prior approvals would not be a determining factor in making a decision on any future request.

Revisions to your proposal may invalidate this authorization. In the event changes to this project are contemplated, I recommend that you coordinate with us prior to proceeding with the work.

This communication does not relieve you of any obligation or responsibility for complying with the provisions of any other laws or regulations of other federal, state or

- 4 -

local authorities. It does not affect your liability for any damages or claims that may arise as a result of the work. It does not convey any property rights, either in real estate or material, or any exclusive privileges. It also does not affect your liability for any interference with existing or proposed federal projects. If the information you have submitted and on which the Corps bases its determination/decision of authorization under the NWP is later found to be in error, this determination may be subject to modification, suspension, or revocation.

A copy of this letter is being provided to the following party: Mr. Rick Whiteside, Corblu Ecology Group, 3225 South Cherokee Lane, Building 800, Woodstock, Georgia, 30188; and Mr. Dane Hanson, City of Sandy Springs, 7840 Roswell Road, Sandy Springs, Georgia 30350.

Thank you in advance for completing our on-line Customer Survey Form located at http://corpsmapu.usace.army.mil/cm_apex/f?p=regulatory_survey. We value your comments and appreciate your taking the time to complete a survey each time you have interaction with our office.

If you have any questions, please contact Ms. Elisha Brannon, Project Manager, Piedmont Branch, at 678-804-5226.

Sincerely,

Edward B. Johnson, Jr.
Chief, Piedmont Branch

Enclosures

Regulatory Division

## CERTIFICATION OF COMPLIANCE
## WITH
## DEPARTMENT OF THE ARMY

PERMIT FILE NUMBER:  SAS-2016-00325

PERMITTEE ADDRESS:  Mr. Dane Hanson, City of Sandy Springs, 7840 Roswell Road, Sandy Springs, Georgia  30350.

LOCATION OF WORK:  The project site is located at Lake Forrest Drive, City of Sandy Springs and City of Atlanta, Fulton County, Georgia (Latitude 33.881085, Longitude - 84.387634).

PROJECT DESCRIPTION:  Project activities have already occurred and included: the drawdown of a previous 3-acre lake to an approximate 0.75-acre lake to accommodate the excavation of a 0.9-acre area of the lake and the installation of a new culvert and riser pipe to allow for the lake to remain drained.

ACRES AND/OR LINEAR FEET OF WATERS OF THE UNITED STATES IMPACTED: 0.9-acre of open water/lake

DATE WORK IN WATERS OF UNITED STATES COMPLETED:

COMPENSATORY MITIGATION REQUIRED: No

I understand that the permitted activity is subject to a U.S. Army Corps of Engineers' Compliance Inspection.  If I fail to comply with the permit conditions at Part C of the Nationwide Permit Program, published in the February 12, 2012, Federal Register, Vol. 77, No.34, Pages 10184-10290, it may be subject to suspension, modification or revocation.

I hereby certify that the work authorized by the above referenced permit as well as any required mitigation (if applicable) has been completed in accordance with the terms and conditions of the said permit.

_____                    _____
Signature of Permittee                                          Date

## NOTIFICATION OF ADMINISTRATIVE APPEAL OPTIONS AND PROCESS
## AND REQUEST FOR APPEAL

| Applicant:  Dane Hanson | File Number:  SAS-2016-00325 | Date:  July 5, 2016 |
|---|---|---|
| Attached is: | | See Section below |
| | INITIAL PROFFERED PERMIT (Standard Permit or Letter of permission) | A |
| | PROFFERED PERMIT (Standard Permit or Letter of permission) | B |
| | PERMIT DENIAL | C |
| | APPROVED JURISDICTIONAL DETERMINATION | D |
| x | PRELIMINARY JURISDICTIONAL DETERMINATION | E |

SECTION I: The following identifies your rights and options regarding an administrative appeal of the above decision. Additional information may be found at http://www.usace.army.mil/CECW/Pages/reg_materials.aspx or Corps regulations at 33 CFR Part 331.

A:  INITIAL PROFFERED PERMIT:  You may accept or object to the permit.

ACCEPT:  If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization.  If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

OBJECT:  If you object to the permit (Standard or LOP) because of certain terms and conditions therein, you may request that the permit be modified accordingly.  You must complete Section II of this form and return the form to the district engineer.  Your objections must be received by the district engineer within 60 days of the date of this notice, or you will forfeit your right to appeal the permit in the future.  Upon receipt of your letter, the district engineer will evaluate your objections and may: (a) modify the permit to address all of your concerns, (b) modify the permit to address some of your objections, or (c) not modify the permit having determined that the permit should be issued as previously written.  After evaluating your objections, the district engineer will send you a proffered permit for your reconsideration, as indicated in Section B below.

B:  PROFFERED PERMIT:  You may accept or appeal the permit.

ACCEPT:  If you received a Standard Permit, you may sign the permit document and return it to the district engineer for final authorization.  If you received a Letter of Permission (LOP), you may accept the LOP and your work is authorized. Your signature on the Standard Permit or acceptance of the LOP means that you accept the permit in its entirety, and waive all rights to appeal the permit, including its terms and conditions, and approved jurisdictional determinations associated with the permit.

APPEAL:  If you choose to decline the proffered permit (Standard or LOP) because of certain terms and conditions therein, you may appeal the declined permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer.  This form must be received by the division engineer within 60 days of the date of this notice.

C:  PERMIT DENIAL:  You may appeal the denial of a permit under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer.  This form must be received by the division engineer within 60 days of the date of this notice.

D:  APPROVED JURISDICTIONAL DETERMINATION:  You may accept or appeal the approved JD or provide new information.

ACCEPT:  You do not need to notify the Corps to accept an approved JD.  Failure to notify the Corps within 60 days of the date of this notice means that you accept the approved JD in its entirety, and waive all rights to appeal the approved JD.

APPEAL:  If you disagree with the approved JD, you may appeal the approved JD under the Corps of Engineers Administrative Appeal Process by completing Section II of this form and sending the form to the division engineer.  The division engineer must receive this form within 60 days of the date of this notice.

E:  PRELIMINARY JURISDICTIONAL DETERMINATION:  You do not need to respond to the Corps regarding the preliminary JD.  The Preliminary JD is not appealable.  If you wish, you may request an approved JD (which may be appealed), by contacting the Corps district for further instruction.  Also you may provide new information for further consideration by the Corps to reevaluate the JD.

SECTION II - REQUEST FOR APPEAL or OBJECTIONS TO AN INITIAL PROFFERED PERMIT

REASONS FOR APPEAL OR OBJECTIONS:  (Describe your reasons for appealing the decision or your objections to an initial proffered permit in clear concise statements.  You may attach additional information to this form to clarify where your reasons or objections are addressed in the administrative record.)

ADDITIONAL INFORMATION: The appeal is limited to a review of the administrative record, the Corps memorandum for the record of the appeal conference or meeting, and any supplemental information that the review officer has determined is needed to clarify the administrative record.  Neither the appellant nor the Corps may add new information or analyses to the record.  However, you may provide additional information to clarify the location of information that is already in the administrative record.

POINT OF CONTACT FOR QUESTIONS OR INFORMATION:

| If you have questions regarding this decision and/or the appeal process you may contact:<br>Elisha Brannon<br>US Army Corps of Engineers, Savannah District<br>1590 Adamson Parkway, Suite 200<br>Morrow, Georgia 30260-1777<br>678-804-5226 | If you only have questions regarding the appeal process you may also contact:<br>Administrative Appeal Review Officer<br>CESAD-PDS-O<br>US Army Corps of Engineers, South Atlantic Division<br>60 Forsyth Street, Room 10M15<br>Atlanta, Georgia  30303-8801 |
|---|---|

RIGHT OF ENTRY:  Your signature below grants the right of entry to Corps of Engineers personnel, and any government consultants, to conduct investigations of the project site during the course of the appeal process.  You will be provided a 15-day notice of any site investigation, and will have the opportunity to participate in all site investigations.

| | Date: | Telephone number: |
|---|---|---|
| Signature of appellant or agent. | | |

DECISION DOCUMENT
FOR
NATIONWIDE PERMIT (NWP)/REGIONAL GENERAL PERMIT (RGP) VERIFICATION

1. Permit Number: SAS-2016-00325

2. Applicant: Mr. Dane Hanson, City of Sandy Springs

3. Project Location: The project site is located at Lake Forrest Drive, City of Sandy Springs and City of Atlanta, Fulton County, Georgia (Latitude 33.881085, Longitude -84.387634).

4. Date Received: 15 Apr 2015

5. Date Additional Information Requested: 9 May 2016

6. Date Federally Complete: 23 Jun 2016

7. Waters of United States:  (See enclosed Jurisdictional Determination Form(s))

8. Authority: _____ Section 10 __x___ Section 404 _____ Section 103

9. Project Description: The City of Sandy Springs proposes to draw down the 3 acre lake to a 0.75-acre lake to allow for the installation of a new culvert and riser pipe at a lower elevation within the lake bottom. The new structures at the lower elevation would allow for the lake to stay drained and for minimal flows to exit the site which should alleviate any stress on the Category 1 Dam. City of Sandy Springs will be evaluating more permanent solutions to the dam/road maintenance needed to address the Category 1 status of the dam.

Based on information provided and other available information, the project qualifies for an after-the-fact authorization under NWP 3 for Maintenance. The project would result in only minimal adverse impacts to the aquatic environment and would have no effect on endangered species or cultural resources. Project activities would involve the drawdown of the lake from 3 acres to a 0.75-acres. A new culvert and riser pipe would be installed at a lower elevation within the lake bottom to allow for the lake to remain drained long-term.

This ATF permit serves as resolution to the unauthorized activity. The applicant completed the work without a permit and discharged dredged material directly into a Waters of the United States without a permit. The applicant also did not have any Best Management Practices (BMP's) in place at the time of discovery.

A separate permit application will be required to evaluate the reconstruction of the dam/road.

10. Project Purpose:  Maintenance

11. Type of Permit Verified: After-the-fact NWP 3 for Maintenance.

12. Pre-Construction Notification Required: ___x___ YES _____ No

13. Coordination with Agencies/Tribes: _x___ YES: 22Apr2016
14. Commenting Agencies:

   a. National Park Service recommended the use of BMPs and a long-term maintenance protocol.

15. Substantive Issues and the Corps Position: Upon discovery of the unauthorized activity, it was determined that excavation of the project area had occurred without prior authorization, a change in use had taken place, and an impact greater than 0.1-acre of impact (draining the lake from 3 acres to 0.75-acres) had already taken place. All of these activities required notification to the Corps for prior approval. It was also brought to our attention, via photos and video, that the contractor on-site was directly discharging excavated/dredged material directly into the riser pipe. This too was a violation of the Clean Water Act. A site visit was conducted 12 Apr 2016 which verified the unauthorized activity as well as the improper use of one BMP (a floating silt curtain) and no other BMPs. The spoil/dredged material was not stabilized. The dredged material was being directly placed back into the lake without any BMPs to prevent the dredged material and return water from returning into the lake. The activities were conducted in the wet (i.e. the lake was drained down but was still holding water in excavated areas. The construction area was also not stabilized.

As resolution of the unauthorized activities, City of Sandy Springs agreed to contact the contractor immediately with our concerns to prevent them from discharging any further materials into the riser pipe, would immediately implement proper BMPs, and would submit a NWP 3 after-the-fact permit application. A tolling agreement was signed on 23 Jun 2016, which completed the file for a NWP verification. The applicant has stabilized the area, the contractor is no longer on site. The lake will remain drained (at 0.75-acres in size) while the City of Sandy Springs determined the most practicable way of reconstructing the dam which has been categorized as a Category 1 dam. A separate authorization will be needed to be submitted to the Corps at that time.

16. Compliance with Other Federal Laws (If not applicable -- N/A):

   a. Endangered Species Act:

      (1) Name of species present: none

      (2) Effects Determination: no effect

      (3) Date of Service(s) concurrence: NA

      (4) Basis for "no effect" determination: no species or habitat present

   b. Magnuson-Stevens Act (Essential Fish Habitat): NA

2

   c. Section 106 of National Historic Preservation Act:

     (1) Known site present:  No

     (2) Survey Required/conducted: No

     (3) Effects Determination: No effect

     (4) Rationale: no resources present.

     (5) Date consultation complete: NA

  d. Section 401 of Clean Water Act:

     (1) Individual certification required:  _____ YES __x___ NO.  If yes:

  e. Coastal Zone Management Act: NA

17.  Special Conditions Required:  __x___ YES; The special conditions below were added to ensure proper BMPs are implemented, all other authorizations are obtained, and that all activities are in compliance with general and regional conditions.

   1. The activity is conducted in accordance with the information submitted and meets the conditions applicable to the NWP, as described at Part C of the NWP Program and the Savannah District's Regional Conditions for NWPs.

   2. You shall obtain and comply with all appropriate federal, state, and local authorizations required for this type of activity.  A stream buffer variance may be required from the Georgia Department of Natural Resources, Environmental Protection Division (Georgia EPD), as defined in the Georgia Erosion and Sedimentation Control Act of 1975, as amended.  Information concerning variances can be obtained at the Georgia EPD's website at www.epd.georgia.gov, or by calling (404) 463-1511.

   3. All work conducted under this permit shall be located, outlined, designed, constructed and operated in accordance with the minimal requirements of the Georgia Erosion and Sedimentation Control Act of 1975, as amended.  Utilization of plans and specifications contained in the "Manual for Erosion and Sediment Control," (Latest Edition), published by the Georgia Soil and Water Conservation Commission, will aid in achieving compliance with the aforementioned minimal requirements.

   4. You shall install and maintain erosion and sediment control measures in upland areas of the project site, in accordance with the Georgia Erosion and Sedimentation Control Act of 1975, as amended, to minimize the introduction of sediment into and the erosion of streams, wetlands and other waters of the United States.  This permit does not authorize installation of check-dams, weirs, riprap, bulkheads or other erosion control measures in streams, wetlands or other waters of the United States.  Authorization would be required

3

from the U.S. Army Corps of Engineers prior to installing any erosion control measures in waters of the United States.

5. You shall install and maintain erosion and sediment control measures for all fill material that is authorized to be discharged in streams, wetlands and other waters of the United States, in accordance with the Georgia Erosion and Sedimentation Control Act of 1975, as amended, and permanently stabilize fill areas at the earliest practicable date.

6. You fill out and sign the enclosed certification and return it to our office within 30 days of completion of the activity authorized by this permit.

18. Compensatory Mitigation Required: No

19. DETERMINATION: I have reviewed the proposed project and determined that the work will result in minimal individual and cumulative adverse effects on the aquatic environment. This project, with the special conditions listed in paragraph 17 above, complies with all terms and conditions of the NWP including any applicable Regional Conditions.


Prepared By:

*Elisha Brannon*                                          8 July 2016

Elisha A. Brannon
Project Manager, Piedmont Branch


Approved By:

*Edward B. Johnson*                                     July 8, 2016

Edward B. Johnson
Chief, Piedmont Branch

4

**EXPANDED PRELIMINARY JURISDICTIONAL DETERMINATION FORM**

<u>BACKGROUND INFORMATION</u>

A.  **REPORT COMPLETION DATE FOR PRELIMINARY JURISDICTIONAL DETERMINATION (JD):**
3/11/16

B.  **NAME AND ADDRESS OF PERSON REQUESTING PRELIMINARY JD:**
William A. Pruitt
Corblu Ecology Group
3225 South Cherokee Lane, Building 800
Woodstock, GA 30188

C.  **DISTRICT OFFICE, FILE NAME, AND NUMBER:**
Piedmont Branch Office, Morrow, Corblu Project No. 02-080913

D.  **PROJECT LOCATION(S) AND BACKGROUND INFORMATION:** The use of Nationwide Permit No. 3(a) and 3(b) [NWP 3(a)(b) – Maintenance] is proposed to conduct dam repair on a 60+ year old dam, which poses a threat to public safety.  Dam maintenance/repair includes lake drawdown and subsequent dam repair, included the installation of a trench box and HDPE riser.

**(USE THE ATTACHED TABLE TO DOCUMENT MULTIPLE WATERBODIES AT DIFFERENT SITES)**
State: Georgia          County/parish/borough: Fulton          City: Sandy Springs / Atlanta
Center coordinates of site (lat/long in degree decimal format): Lat.33.881024° N, Long. -84.387401° W.

Universal Transverse Mercator: Zone 16N

Name of nearest waterbody: Unnamed tributary to Nancy Creek

Identify (estimate) amount of waters in the review area:
Non-wetland waters: Open Water linear feet:0  width (ft) and/or 3.00 acres.
Cowardin Class: NA
Stream Flow: NA

Wetlands:0.00 acres.
Cowardin Class: NA

Name of any water bodies on the site that have been identified as Section 10 waters:

Tidal:

Non-Tidal:

E.  **REVIEW PERFORMED FOR SITE EVALUATION (CHECK ALL THAT APPLY):**
☒ Office (Desk) Determination.  Date: April 11, 2016
☒ Field Determination.  Date(s): April 11, 2016

1. The Corps of Engineers believes that there may be jurisdictional waters of the United States on the subject site, and the permit applicant or other affected party who requested this preliminary JD is hereby advised of his or her option to request and obtain an approved jurisdictional determination (JD) for that site.  Nevertheless, the permit applicant or other person who requested this preliminary JD has declined to exercise the option to obtain an approved JD in this instance and at this time.

2. In any circumstance where a permit applicant obtains an individual permit, or a Nationwide General Permit (NWP) or other general permit verification requiring "pre-construction notification" (PCN), or requests verification for a non-reporting NWP or other general permit, and the permit applicant has not requested an approved JD for the activity, the permit applicant is hereby made aware of the following: (1) the permit applicant has elected to seek a permit authorization based on a preliminary JD, which does not make an official determination of jurisdictional waters; (2)

that the applicant has the option to request an approved JD before accepting the terms and conditions of the permit authorization, and that basing a permit authorization on an approved JD could possibly result in less compensatory mitigation being required or different special conditions; (3) that the applicant has the right to request an individual permit rather than accepting the terms and conditions of the NWP or other general permit authorization; (4) that the applicant can accept a permit authorization and thereby agree to comply with all the terms and conditions of that permit, including whatever mitigation requirements the Corps has determined to be necessary; (5) that undertaking any activity in reliance upon the subject permit authorization without requesting an approved JD constitutes the applicant's acceptance of the use of the preliminary JD, but that either form of JD will be processed as soon as is practicable; (6) accepting a permit authorization (e.g., signing a proffered individual permit) or undertaking any activity in reliance on any form of Corps permit authorization based on a preliminary JD constitutes agreement that all wetlands and other water bodies on the site affected in any way by that activity are jurisdictional waters of the United States, and precludes any challenge to such jurisdiction in any administrative or judicial compliance or enforcement action, or in any administrative appeal or in any Federal court; and (7) whether the applicant elects to use either an approved JD or a preliminary JD, that JD will be processed as soon as is practicable. Further, an approved JD, a proffered individual permit (and all terms and conditions contained therein), or individual permit denial can be administratively appealed pursuant to 33 C.F.R. Part 331, and that in any administrative appeal, jurisdictional issues can be raised (see 33 C.F.R. 331.5(a)(2)). If, during that administrative appeal, it becomes necessary to make an official determination whether CWA jurisdiction exists over a site, or to provide an official delineation of jurisdictional waters on the site, the Corps will provide an approved JD to accomplish that result, as soon as is practicable. This preliminary JD finds that there *"may be"* waters of the United States on the subject project site, and identifies all aquatic features on the site that could be affected by the proposed activity, based on the following information:

**SUPPORTING DATA. Data reviewed for preliminary JD (check all that apply - checked items should be**
included in case file and, where checked and requested, appropriately reference sources below):
☒ Maps, plans, plots or plat submitted by or on behalf of the applicant/consultant: Figures 1-4, Appendices A,B, and E .
☐ Data sheets prepared/submitted by or on behalf of the applicant/consultant.
    ☐ Office concurs with data sheets/delineation report.
    ☐ Office does not concur with data sheets/delineation report.
☐ Data sheets prepared by the Corps:
☐ Corps navigable waters' study:
☐ U.S. Geological Survey Hydrologic Atlas:
    ☐ USGS NHD data.
    ☐ USGS 8 and 12 digit HUC maps.
☒ U.S. Geological Survey map(s). Cite scale & quad name: Figure 1; 1:24,000; Sandy Springs, GA.
☒ USDA Natural Resources Conservation Service Soil Survey. Citation:Fulton County Soils.
☒ National wetlands inventory map(s). Cite name:Fulton County NWI.
☐ State/Local wetland inventory map(s):
☒ FEMA/FIRM maps:Appendix B.
☐ 100-year Floodplain Elevation is:    (National Geodetic Vertical Datum of 1929)
☒ Photographs: ☒ Aerial (Name & Date):Fulton County NAIP 2015.
    or ☒ Other (Name & Date):Photographs 1-4; April 11, 2016.
☐ Previous determination(s). File no. and date of response letter:
☐ Other information (please specify):

**IMPORTANT NOTE: The information recorded on this form has not necessarily been verified by the Corps and should not be relied upon for later jurisdictional determinations.**

_Elisha Brannen_ 8 Jul 2016        _signature_ 4/11/16
Signature and date of                                Signature and date of
Regulatory Project Manager                  person requesting preliminary JD
(REQUIRED)                              (REQUIRED, unless obtaining the signature is impracticable)

| Site | Latitude | Longitude | Cowardin Class | Estimated amount of aquatic resource in review area | Class of aquatic resource |
|------|----------|-----------|----------------|-----------------------------------------------------|---------------------------|
| OW1 | 33.881576° | -84.388660° | Palustrine, Unconsolidated Bottom, Permanently Flooded, Impounded | 3.00 acres | non-section 10 - wetland |